Louis Brechu *v.* Rapid Transit Company, Inc.

Superior Court      New London County      File No. 23787

Memorandum filed January 2, 1957.

*Norman Zolot,* of Hamden, for the claimant.

*William J. Cousins,* of New Haven, for the defendant.

*John J. Bracken,* attorney general, and *Harry Silverstone,* assistant attorney general, of Hartford, for the Administrator, Unemployment Compensation Act.

KING, J. The claimant is a truck driver employed by the defendant trucking company. This employment was pursuant to the provisions of a so-called "labor-management contract" which set forth, in considerable detail, the terms and conditions of employment. It was signed by the defendant, and, under date of October 13, 1953, by one Rice, as secretary, treasurer and business agent of General Teamsters Local Union 493, to which union the claimant belonged, and which covered the so-called New London area embracing Jewett City, where the defendant maintained its place of business.

The provisions here material appeared in Article 17 of § 6 of the contract, and in effect provided: (a) that the contract should run from April 11, 1953, for two years, and "shall then and thereafter renew itself from year to year" unless written notice is given by either party to the other, not less than sixty days prior to any date of expiration, of a desire to change the terms and conditions; and (b) that "during the course of negotiations for amendment of renewal of the agreement, the terms and conditions herein set forth shall continue in effect, and any changes finally agreed upon with respect to wages or money allowances shall be retroactive to the date of expiration [here April 11, 1955] and effective as of that date."

The sixty-day notice was given by claimant's local union 493 to the defendant sometime prior to February, 1955, and thereafter negotiations as to a new contract continued between a negotiating committee of the employers and one representing the unions until June 26, 1955, when a new contract was orally agreed upon which was to run for three years from April 11, 1955. The actual contract with the defendant does not appear in the case. A contract generally similar is the contract between The Adley Express Company, hereinafter referred to as Adley, and the

local union 443, to which Adley's drivers, but not the claimant, belonged. The commissioners found, upon proper evidence, that particular provisions were agreed upon, orally or in writing, between a given union and a given employer, over and above those set forth in the general contract, which except for such particular provisions was uniform and followed in its terms the Adley contract.

On June 14, 1955, while the claimant and his fellow employees were engaged in the duties of their employment, the defendant notified them that it was shutting down its operations because of "fear of strike." Thereafter no work was given the defendant's drivers, including the claimant, until June 26, 1955, although they reported for work, and were ready, willing and able to work, during the entire period.

The claimant claims unemployment benefits for the period during which the defendant's business was shut down. Three unemployment commissioners, acting as a panel, held hearings on this case at New Haven over a period of days during the early part of 1956. From their decision in favor of the claimant the defendant has appealed. It was agreed that the decision in this case should govern, and be dispositive of, a large number of other claims arising because of similar closings, effective during about the same period, on the part of other trucking concerns operating out of Connecticut.

The defendant's basic claim is that under the provisions of General Statutes § 7508 (3) the claimant is disqualified from receiving benefits.

With one exception, none of the subordinate facts set forth in paragraphs 3 and 4 of the motion to correct the findings of facts and which the commissioners refused to add was admitted or conceded. The

single exception is that portion of subdivision (c) of paragraph 4 of the motion to correct which summarizes the provisions of the contract effective from April 11, 1953, to April 11, 1955. This addition is entirely unnecessary since this entire contract was incorporated in paragraph 11 of the finding and award as originally made. It follows that none of the additions to the finding sought in paragraphs 3 and 4 of the motion to correct can be added in this court. Practice Book §§ 312, 322; *Civitello* v. *Connecticut Savings Bank,* 128 Conn. 621, 625.

None of the deletions from the finding sought in paragraphs 1 and 2 of the motion to correct and which the commissioners refused to eliminate was found without evidence. For example, the portion of paragraph 38 of the finding and award sought to be eliminated in paragraph 2 of the motion to correct is amply supported by the testimony of Rice on pages c-23 and c-24 of the transcript. It follows that none of these deletions can be made.

Actually, paragraphs 34, 35, 36 and 37 of the finding and award embraced ultimate facts and conclusions of law, and in no real sense of the phrase should it be said that they were "not supported by the evidence." Whether or not they should be stricken depended, as to ultimate conclusions of fact, upon whether they were supported by the subordinate facts properly found; and as to conclusions of law, on the governing law of the case. In so far as they were ultimate facts, they were amply supported by the subordinate facts and cannot be eliminated. In so far as they involve conclusions of law, they will hereinafter be considered.

Under the terms of the contract between the claimant's union and the defendant, previously quoted, it was the duty of labor and management to continue to maintain operations while negotiations

for a new contract were in progress. When, on June 12, the union struck certain trucking companies, the union broke the contract as to such employers. And of course no unemployment benefits would be paid striking employees of such employers, since their unemployment was voluntary and due to a labor dispute.

But that is not this case. Here there was no strike against the defendant employer. It chose to cease operations. Negotiations for the new contract were proceeding. Indeed, a new contract was agreed upon on or about June 26, when the Adley contract was accepted by the representative negotiators, subject to ratification, which subsequently took place, between each individual employer, including the defendant, and the individual union, including local union 493, to which his drivers, including the claimant, belonged.

The claim of the defendant is, in essence, that since claimant's union struck Adley and certain other employers, key men in whose organizations were negotiating the provisions of the new general contract with a negotiating group from the unions, all other employers, including the defendant, had a right to shut down. This is a complete non sequitur.

It is a fundamental principle of our Unemployment Compensation Act that benefits may not be allowed persons whose unemployment is voluntary. This is true whether or not in any way connected with a labor dispute. *Carper* v. *Administrator*, 139 Conn. 515, 520. In pursuance of that policy, the act (§ 7508 [3]) provides that an employee shall be ineligible for benefits if his unemployment "is due to the existence of a labor dispute" at his place of employment.

There is considerable question as to whether there was any "labor dispute" involving the defendant,

either at its place of business or anywhere else. See *General Motors Corporation* v. *Mulquin*, 134 Conn. 118, 130, and *Alvarez* v. *Administrator*, 139 Conn. 327, 333, 336. To be sure, there was argument and wrangling between the negotiators over the terms of the proposed new contract, as is generally the case in such situations. The union negotiators made divers "demands" as to what should be in the new contract. The witness Adley, on the part of the employers, told the unions' negotiators that a certain proposal was the employers' "final offer." But he testified he did not literally mean it, and that he kept on negotiating until ultimately an accord was reached. On June 12 the unions struck Adley and some other trucking concerns. But as far as the remaining trucking companies were involved, including the defendant, negotiations continued and the trucks operated as usual until June 14, when the defendant shut down its operations and threw its drivers, including the claimant, out of work. In the court's view of the case, it is immaterial whether or not a "labor dispute" was in existence at the defendant's plant in Jewett City, and it may be assumed, without being decided, that such was the case.

Ordinarily, when an employer shuts down his business, as was the case here, the resulting involuntary unemployment of his employees entitles them to benefits under § 7507. This is true regardless of the motive for shutting the plant down, and even though the doors of the establishment are locked so that in the physical and generic sense of the term there is a lockout. In other words, merely because there is a closing of his business by an employer, and, so, in a generic sense, a lockout, does not, in and of itself, disentitle employees to unemployment compensation. For in that sense of the word, whenever a plant is closed, whether because of the bankruptcy of management, lack of orders, or for any other reason,

there may be said to be a lockout. In other words a shutdown by management is, in the generic sense, a lockout, since obviously the existence of a lockout does not depend upon whether every door of a closed plant is literally locked. It is only when certain facts are proven, under § 7508, that the employee of a closed-down business becomes disqualified from receiving benefits. *Waskiewicz* v. *Egan,* 15 Conn. Sup. 286, 287. In this case, it is claimed that the provisions of § 7508 (3) operated to disqualify this claimant.

Section 7508 (3) provides for a disqualification if the administrator finds that the unemployment "is due to the existence of a labor dispute" at the employer's plant, subject to three exculpatory provisos respectively listed in subdivisions (a) and (b) and in the so-called "lockout proviso" added in 1941. Sup. 1941, § 718f. No one of these three exculpatory provisos need be considered, nor do they come into a case, unless and until it is found that this subsection (3) of § 7508 is applicable, that is, that a claimant's unemployment is "due to the existence of a labor dispute." This involves the coexistence of two elements, (1) a labor dispute and (2) unemployment "due to" the existence of such labor dispute.

The words "due to" as used in § 7508 (3), mean "caused by." They do not mean merely "occurring in the course of," as seems to be the fundamental claim of the defendant. The element of causation is indispensable. *Lanyon* v. *Administrator,* 139 Conn. 20, 32. This must be so if the fundamental principle of the act to penalize only voluntary unemployment (including, of course, such labor activities as striking) is to be preserved. In other words, whether this shutdown of the defendant's place of business occurred "in the course of" a labor dispute is not dispositive. The vital question is whether it was "caused

by" a labor dispute. The answer to this last question is decisive of this appeal, and depends upon the true reason for the shutdown of the defendant's business, that is, its subjective state of mind. *Bartlett* v. *Administrator,* 142 Conn. 497, 505; see *Lanyon* v. *Administrator,* supra, 33.

The defendant gave two basic reasons for this shutdown. The first was that it could get little or no business from shippers because of the strike against some of the trucking concerns and the consequent publicity. The commissioners refused to find that this was correct. There is nothing to require such a finding. Indeed, the testimony of the witness Adley, alone, supports the action of the commissioners. The second reason was "fear of a strike," with shipments stranded along the road and consequent suits for damages by shippers. There was no strike, and the commissioners were fully justified in refusing to find that the defendant shut down its plant for fear of one. It is the defendant's claim that when the unions struck a selected few truckers, many of the others, including this defendant, after an informal meeting attended by but a few, by mere coincidence and without any concert of action, suddenly were seized by such a fear of a strike that within two days they decided they must stop all operations. It is not surprising that this claim was not credited by the commissioners, especially since a number of other trucking concerns who were parties to the negotiations continued to operate their trucks without incident during the entire period of negotiations.

The situation here is analogous in principle to unemployment caused by refusal to cross a picket line. The mere refusal is not decisive. The question is whether the refusal was voluntary, so that the resulting unemployment was voluntary, and, so, of

course not compensable, or whether the refusal was involuntary because of actual physical obstruction to passage or an honest and reasonable fear of probability of physical injury if an attempt to cross the picket line is made. The decisive factor is the state of mind. *Lanyon* v. *Administrator,* supra.

Here the commissioners refused to find that the action of the defendant in closing its plant was "due to" either of the claimed reasons. No other reasons were given or claimed by the defendant. It follows that the shutdown was not "caused by" a labor dispute within the terms of § 7508 (3), and consequently there is no occasion to consider any one of the three exculpatory provisos. The shutdown was a voluntary act of the defendant occurring in the course of the negotiations for a new contract and calculated to improve its bargaining power. See paragraphs 1 (b), (c) and (d) of commissioners' amendments to finding. The commissioners' decision was perhaps lacking in clarity of expression. However, it did clearly appear, in the original finding, that they were applying the foregoing rule, and correctly.

The issue was confused, as it seems to the court, by the claims made under the lockout proviso, especially the claims made by the defendant in seeking corrections of the finding. For the reasons previously stated, the lockout proviso, in view of the original finding, never came into this case. The additions to the finding made by the commissioners demonstrate that even assuming, contrary to the court's view, that facts necessary to bring the lockout proviso into the case were proven, the decision would be unchanged. Thus no harm was done, since the commissioners' decision was correct even assuming that the lockout proviso was in the case.

The defendant's reasoning in its trial brief, and apparently its position before the commissioners, is

that in case of a voluntary shutdown, so that there is a lockout in the generic sense of a locking of the doors of a plant, and negotiations for a labor contract are taking place, there are no rights to unemployment benefits unless the provisions of the lockout proviso are satisfied. That is, no employee, under such circumstances, is entitled to any benefits unless he can prove that the employer, by the lockout, was trying to impose terms on the employees which in reason they could not accept. This is obviously incorrect. There is no such provision in the statute. Where, as here, the lockout is not caused by a labor dispute but by the voluntary act of the employer, there is, as here, a lockout in the generic sense, to be sure, but not one involving the lockout proviso. The reasoning of our so-called "lockout" cases necessarily has no application to such a situation. This is made clear in *Bartlett* v. *Administrator,* 142 Conn. 497, 505. To hold otherwise would be completely to distort and emasculate the entire act in all situations where, while labor-management contract negotiations were in progress, a plant was voluntarily shut down by management. Apparently, under the defendant's claim, in any such situation the burden of proving that the lockout was an instrumentality used by the employer to impose terms on the employee which in reason he could not accept would be thrust on the claimant. By refusing to disclose any demands, the employer could always defeat any claim for benefits during a contract negotiating period. The mere statement of this proposition is sufficient to refute it.

While this is dispositive of the case, adversely to the defendant, the decision would be the same even if it were held that the defendant's shutdown of its plant was due to the existence of a labor dispute on its premises within the meaning of § 7508 (3), since it still remains that the commissioners were

entitled to find, as they did, that the lockout, assuming there was one in the precise sense of the word as used in this particular proviso, was not in fact caused by any demands of the employees on this defendant. As previously pointed out, no demands had been made except for those ordinarily incident to any negotiating procedure. Actually, the commissioners went further and affirmatively found, as a reasonable inference once the defendant's claims as to its reasons for a shutdown had been discredited, that the lockout was motivated as set forth in paragraphs 35, 36 and 37 of the amended finding. However, it should not be overlooked that this latter finding was wholly unnecessary, since the commissioners had failed to find that the lockout resulted "from demands of the employees," as provided in the lockout proviso; and this is so even under the defendant's claim that the facts necessary to bring the lockout proviso into the case had been established.

It is true that, as previously pointed out, the defendant tried to induce the commissioners to find that the lockout was caused by (1) lack of business and (2) fear of a strike. Had they so found, an entirely different situation would have been presented. But the commissioners failed to accept either of these disputed claims and the court has no power to correct the finding incorporating either of them into it.

For the foregoing reasons the appeal is dismissed and the award affirmed.